**In re Mary Beth HARRIS, Debtor.**

**Mary Beth HARRIS, Plaintiff,**

**v.**

**PENNSYLVANIA HIGHER EDU-
CATION ASSISTANCE
AGENCY, Defendant.**

**Bankruptcy Nos. 88–20579, 88–2060A.**

United States Bankruptcy Court,
W.D. New York.

June 28, 1989.

Shults & Shults by David A. Shults, Hornell, N.Y., for debtor.

Harris, Beach, Wilcox, Rubin & Levey (David L. Rasmussen, of counsel to K. Kevin Murphy, Staff Counsel), Rochester, N.Y., for Pennsylvania Higher Educ. Assistance Agency.

## AMENDED MEMORANDUM
## AND DECISION

EDWARD D. HAYES, Bankruptcy Judge.

This debtor filed a petition under Chapter 7 of the Bankruptcy Code on April 22, 1988. Her schedules listed a $19,116.87 unsecured debt to Pennsylvania Higher Education Assistance Agency ("PHEAA") as guarantor of student loans taken by the debtor between 1977 and 1983. The remainder of her unsecured debt totalled $2,931.35. On October 24, 1988, the debtor filed a complaint under § 523(a)(8) of the Bankruptcy Code, seeking determination by the Court that her debt to PHEAA was dischargeable. 11 U.S.C. § 523(a)(8). A hearing was held on April 5, 1989, at which the Court reserved judgment.

The debtor's history is complex. After false starts at two colleges beginning in 1974, the debtor entered Allegheny College in Meadville, Pennsylvania in 1977. She graduated from Allegheny in June, 1981 with a bachelor's degree in economics. She then entered an M.B.A. program, but dropped out. By her testimony she experienced great difficulty finding work in her chosen field, and from January, 1982 to August, 1983 she worked at unskilled jobs earning at or near the minimum wage. In August, 1983 the debtor enrolled in a one-year course in respiratory therapy, which

she completed. With the certificate thus obtained, she found a position as a respiratory practitioner earning $7.75 per hour. In February, 1988 she relocated to Hornell, New York, finding employment in her new field at $10.25 per hour. In October, 1989, she was promoted to assistant director of respiratory therapy; as a result, she now earns $13.50 per hour. Between September, 1977 and February, 1983, the debtor obtained the eight student loans, totalling $16,700 and guaranteed by PHEAA, which are the subject of this action.

In August, 1981 she married Hadi Hamerz, but they separated almost immediately and were divorced in 1987. From this relationship, the debtor has a fourteen-year old daughter. In April, 1988, the debtor married Allen Harris, but the couple separated after three months. From this relationship, she has two children, two years and one year old, and expects a third in August.

The student loans which are the subject of this action first came due in November, 1985.[1] The debtor requested and received a one-year deferment on the loans to November, 1986. When that deferment expired, she requested another but was told she was no longer eligible for deferment. She thereupon consulted an attorney and determined to file for bankruptcy. Various filings were attempted but the debtor did not successfully commence her bankruptcy case until April, 1988, after her relocation to New York. Testimony at the hearing indicated that the debtor made one $50 payment prior to defaulting on the loans, and one $10 payment in February, 1988; the regular monthly payments due PHEAA were $207. PHEAA obtained a judgment against the debtor on October 1, 1987, but a wage garnishment was rendered ineffective by the debtor's maternity leave and subsequent resignation from the job she then held.

■ The debtor relies on the "undue hardship" exception of § 523(a)(8)(B) to support her request for a discharge of the student loans.[2] This provision has been the subject of many bankruptcy decisions, including several in this court, but until recently there was no unifying authority in the Second Circuit as to the standard which must be met to show undue hardship. In 1987, the Second Circuit Court of Appeals, upholding a decision of the District Court reversing a bankruptcy court's discharge of a student loan, adopted the undue hardship standard promulgated in the District Court decision. *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2d Cir.1987), *aff'g* 46 B.R. 752 (S.D.N.Y.1985). Consequently, in the Second Circuit, to obtain a discharge of a student loan under § 523(a)(8)(B), a debtor must make a three-part showing of undue hardship, as follows: "that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; *and* (3) that the debtor has made good faith efforts to repay the loans." *Id.* at 396 (emphasis added).

Applying the first prong of the Second Circuit's test, the debtor's income is as follows: $13.50 per hour for a 40–hour week, plus $50 biweekly for required overtime, plus $50 per week in child support for her two younger children from her husband, Allen Harris. The child support will increase when the Harris' third child is born; a pro-rata increase would result in

---

**1.** Because this debt became due less than five years before the debtor filed her petition, it is non-dischargeable under § 523(a)(8)(A), as the debtor conceded at the hearing.

**2.** Section 523. Exceptions to discharge.

(a) A discharge under section 727, ... of this title does not discharge an individual debtor from any debt—

(8) for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or a nonprofit institution, unless—

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents;

...

11 U.S.C. § 523.

weekly child support payments of $75. Thus the debtor's gross monthly income is currently $2,644.50, and will increase to approximately $2,752. This represents an annual income of from $31,700 to $33,000.

An accurate determination of the debtor's monthly expenses is difficult due to the conflicting information provided by the debtor at various times. On the schedules she originally filed with the Court, she showed monthly expenses of $250 for rent, $50 for electricity, $70 for heat, $25 for telephone, $400 for food, $150 for clothing, $40 for laundry and cleaning, $150 for medical and drug expense, $60 for auto insurance, $100 for transportation, $156 for auto payments, $60 for daughter's school, $200 for child care, and $18 for TV, a total of $1,729 per month. However, in evidence offered at the hearing several of these values were increased to the following amounts: $90–115 for heat, $40 for telephone, $600 for food, $210 for medical and drug expenses, $300 for transportation, $169 for auto payments, $320 for child care, and $140 for laundry and cleaning. New expenses were added: $30 for books, $40 for recreation. Clothing expenses were lowered to $120 and auto insurance to $45. The revised monthly expense figure comes to $2,494 per month. The debtor's explanation for the changes was that she had not properly estimated her monthly expenses when completing the schedules, and that the figures offered at the hearing were estimates based on a financial diary she maintained for the month of March, 1989.

The new figures raise numerous questions. The debtor offered no substantive explanation of the $200 per month increase in transportation costs. She offered no explanation at all for the increase from $40 to $140 per month in laundry and cleaning expenses, when by her own testimony she had just purchased a washer and dryer. All four of the children are covered by the debtor's husband's medical insurance,[3] but there was no testimony describing the extent of the coverage. The debtor testified to monthly expenses for medical care, dental care, and drugs of $144. The debtor's financial diary, entered into evidence, listed other monthly expenses such as $32 for an Electrolux service contract, $50 for allowances, $50 for grooming and cosmetics, and $40 for eating out, which were not included in the final tabulation of monthly expenses; apparently there is sufficient slack in the revised monthly expense figure to absorb the unlisted expenses. Finally, there is the matter of an unsecured $2,500 loan from Steuben Education Federal Credit Union (the "credit union") to the debtor in April, 1988, immediately prior to the debtor's bankruptcy filing. The funds from this loan, the debtor testified, were used to repay $1,800 in loans from her father and her sister and to purchase a washer and dryer. The debtor has made regular payments of $228 per month to the credit union, and at the time of the hearing in April expected the loan to be fully repaid by the end of that month.[4]

Taking this conflicting information into account, it is the finding of this Court that an annual income of over $31,000 per year is an adequate income for a family of one adult and four children in the Hornell, New York area, and that the debtor has failed to show that her income would be insufficient to maintain a minimal standard of living for herself and her dependents if she were required to pay off her student loans. Although the debtor's circumstances may not alter dramatically for some time, she has opportunities to increase her income: continued successful performance

---

3. The debtor receives insurance coverage from her own employer, presumably including maternity benefits. The debtor testified that she intended to take an eight-week maternity leave when her fourth child is born, but that she would be compensated for all but three days of it by vacation and sick leave pay.

4. The monthly payments to the Steuben Education Federal Credit Union during the course of the bankruptcy case would appear to be preferential payments avoidable by the trustee under § 547 of the Bankruptcy Code.

as a respiratory therapist, which has already produced two substantial pay increases; receiving maintenance or additional child support from her husband; the possibility, which the debtor has apparently not pursued, of obtaining child support from Hadi Hamerz, the father of her eldest child.[5]

The extreme youth of the debtor's youngest children constitute "additional circumstances" that might prevent any marked upswing in the debtor's standard of living for some time. However, in the absence of a showing of inability to maintain a minimal standard of living in this case, the second prong of the undue hardship test is inapplicable.

The three prongs of the Second Circuit's undue hardship test are conjoined, so that absent a showing by the debtor of good faith efforts to repay her student loans, the debt may not be discharged, even where the debtor is unable to maintain a minimal standard of living.[6] This debtor has not made such a showing of good faith. Although she did obtain a deferment in November, 1985 when the loans came due, and attempted to obtain another deferment when the first expired, she immediately thereafter sought the protection of bankruptcy. Since the loans came due in 1985, the debtor has never made a meaningful effort to repay them and has never attempted to negotiate a more favorable repayment schedule with PHEAA. During this period, however, she has had funds for other purposes, such as the purchase of a new car in April, 1987, six months after completing the payments for the car she purchased in 1983. She promptly repaid debts to her family and regularly made payments on her debt to the credit union until it was fully repaid. From her repeated complaint during testimony that she was charged interest during the year that repayment for the student loans was deferred, it appears that the debtor considered the loans a convenience but resented the attendant inconvenience of repaying them. In addition, the student loans represent over 86% of the total scheduled debt,[7] leading to the conclusion that the debtor's dominant motive in seeking relief in bankruptcy was to evade her student loan obligation. *In re Brown*, 18 B.R. 219, 223 (Bankr.D.Kan.1982). But for the student loans, it is doubtful that she would be in bankruptcy court at all.

The Second Circuit's undue hardship test can produce a harsh result. The District Court noted, § 523(a)(8) commits a student-borrower to repay a government-guaranteed student loan "regardless of his or her subsequent economic circumstances." *Brunner*, 46 B.R. at 756. Application of that test to the facts in this matter result in a determination that the debtor's obligation to PHEAA is not dischargeable.

It is so ordered.

---

5. The debtor testified that unless she eventually completes a "registry examination" she may not be able to maintain her current position at St. James Mercy Hospital. However, bankruptcy courts generally do not take such eventualities into account. *See, e.g. In re Kohn*, 5 B.C.D. 419 (Bankr.S.D.N.Y.1979).

6. The debtor in *Brunner* was denied a discharge even though the District Court found that she was unable to meet her minimal expenses and repay her student loan. This debtor is not in such financial straits. *In re Brunner*, 46 B.R. 752, 757 (S.D.N.Y.1985).

7. In October, 1988, the debtor brought a motion to add three unsecured creditors to her schedules, increasing her total unsecured debt by $691.89. The motion was granted on November 18, 1988, but no order to add the creditors was ever submitted. Addition of those creditors would have resulted in only a trivial reduction in the percentage of student loan debt.