**In re David H. PINCUS, Debtor.**

**David H. PINCUS, Plaintiff,**

**v.**

**GRADUATE LOAN CENTER, Key Bank, USA, the Education Resources Institute, Brooklyn Law School, and Academic Financial Services Association, Defendants.**

**Bankruptcy No. 99–44952(PCB).**

**Adversary No. 99–8674.**

United States Bankruptcy Court,
S.D. New York.

April 16, 2002.

Todtman, Nachamie, Spizz & Johns, P.C., New York City, By Scott S. Markowitz, Esq., for David H. Pincus, Debtor.

Pullman & Comley, LLC, Bridgeport, CT, By Sheila A. Denton, Esq., Holly G. Gydus, Esq., for Educational Credit Management Corporation, Defendant.

Zeichner Ellman & Krause LLP, New York City, By Susan H. Rhee, Esq., Nathan Schwed, Esq., for The Educational Resources Institute, Defendant.

## MEMORANDUM DECISION DENYING DISCHARGE OF DEBTOR'S STUDENT LOANS OWED TO THE EDUCATION RESOURCES INSTITUTE, INC. AND EDUCATIONAL CREDIT MANAGEMENT CORPORATION

PRUDENCE CARTER BEATTY, Bankruptcy Judge.

### I. Background

This adversary proceeding was commenced by a complaint dated November 3, 1999 filed by the debtor who seeks a determination that, based on a claim of undue hardship, he is entitled to the discharge of his two consolidated student loan obligations pursuant to 11 U.S.C. § 523(a)(8).[1] A trial was held on March 2, 2001. The parties were granted an opportunity to submit post-trial memorandums of law, and the matter was taken under advisement. The Court concludes that, under the facts of this case, the indebtedness related to both of the student loans is nondischargeable.

### II. Findings of Fact

On August 10, 1999, David H. Pincus (the "Debtor") filed the above-captioned case under Chapter 7 of the Bankruptcy Code (the "Code"). The Debtor is a thir-

---

1. Code § 523(a)(8) provides in relevant part:
 (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
 (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, ... unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents[.]
 11 U.S.C. § 523(a)(8) (2000).

ty-two year old man who, between September 1992 and June 1995, attended Brooklyn Law School. He graduated in June of 1995 and received his juris doctor degree. The loans in question represent the financing of his tuition and related expenses, including room and board, while he attended law school.

## A. The Debtor's Loans

The Debtor has the following two educational loans: (1) a consolidated federal loan with an aggregate outstanding balance of $79,355.44 as of February 25, 2001, and (2) a consolidated private loan with an aggregate outstanding balance of $61,585.05 as of March 1, 2001. Both of the Debtor's current obligations are the product of a series of multiple loan transactions.

### 1. The Loan Programs

The Debtor financed part of his education through the Guaranteed Student Loan Program, known today as the Federal Family Education Loan Program ("FFELP"). FFELP encompasses four different loan programs: (1) the Federal Stafford Loan Program, (2) the Federal Supplemental Loans for Students Program, (3) the Federal Plus Program, and (4) the Federal Consolidation Program. All four programs are administered by the Secretary of Education.

The Debtor also financed his education through the Law Access Program, a national loan program designed for law students that provides access to three loan programs: (1) the Guaranteed Student Loan (GSL), (2) Supplemental Loans for Students (SLS), and (3) Law Access Loan (LAL). The former two programs receive federal subsidy, while the latter does not. Law Access is coordinated by the Law School Admission Service which works with a number of governmental and financial organizations to deliver the loan programs. These organizations are responsible for insuring loans and providing capital. Different guarantee organizations are involved with federally sponsored loans and privately funded loans.

### 2. The Federal Loans

The Debtor executed six promissory notes as part of the federal loan program with interest rates ranging from 8.00% to 9.13% (the "Federal Loans"). The disbursements on the Federal Loans were as follows:

| Loan Type | Lender | Amount |
| --- | --- | --- |
| GSL | Key Bank, USA, N.A. | $ 8,500 |
| GSL | Key Bank, USA, N.A. | $10,500 |
| SLS | Key Bank, USA, N.A. | $11,500 |
| GSL | Key Bank, USA, N.A. | $ 7,500 |
| GSL | Chemical Bank | $ 7,500 |
| SLS | Chemical Bank | $ 4,000 |

Under the terms of the Federal Loans, after the expiration of the automatic six-month grace period that followed the Debtor's graduation from Brooklyn Law School in June 1995, the first payments became due in December 1995. In order to lower his monthly payments and to obtain a single monthly payment for all the Federal Loans, the Debtor sought to consolidate them in March 1996 under the Law Access Federal Loan Consolidation Program.

The Debtor's Federal Loans were consolidated in May of 1996 with the outstanding balance of $52,848.85 (the "Consolidated Federal Loan"). A new promissory note was executed and the six Federal Loans were paid by Keycorp Student Loan Trust 1995–B as the new consolidated lender ("Keycorp"). American Student Assistance ("ASA") guaranteed the consolidated loan as the guarantor of Keycorp. Under the new consolidated note, the

Debtor's monthly payment for the Consolidated Federal Loan is as follows:

| Beginning | Number of Payments | Monthly Payment |
|---|---|---|
| 06/10/96 | 24 | $403.97 |
| 06/10/98 | 36 | $419.61 |
| 06/10/01 | 300 | $437.93 |

The interest rate is fixed at 9.00%, and the outstanding amount may be prepaid at any time without penalty.

Upon the Debtor's filing in August 1999, Keycorp called on the guarantee of ASA and assigned and delivered the consolidated note to ASA. ASA subsequently assigned its interest in the consolidated note to the Educational Credit Management Corporation ("ECMC"). ECMC is a nonprofit corporation organized under the laws of Minnesota. ECMC was created under the direction of the United States Department of Education to provide specialized guarantor services to the Department of Education pursuant to FFELP, including the transfer of title to certain student loan accounts when a borrower has filed for bankruptcy. ECMC is a defendant in this action and the holder of the Federal Loans.

Prior to consolidation of the Federal Loans, the Debtor did not make any payments on them. The first payment on the Consolidated Federal Loan was due on June 10, 1996. On three occasions—June 1996, June 1997, and June 1998—the Debtor obtained one-year forbearances which deferred payment through June 1999. As of February 25, 2001, the principal balance due and owing by the Debtor under the Consolidated Federal Loan was $71,697.97, and accrued and unpaid interest amounted to $7,657.47, for a total outstanding obligation of $79,355.44. Interest continues to accrue on the loan at the per diem rate of $17.67.

### 3. The Private Loans

The Debtor further financed his education by executing four notes as part of the Law Access Program (the "Private Loans"). The disbursements on the Private Loans were as follows:

| Loan Type | Lender | Amount |
|---|---|---|
| BEL (Bar Exam Loan) | Key Bank, USA, N.A. | $ 5,300 |
| LAL | Key Bank, USA, N.A. | $11,500 |
| LAL | Key Bank, USA, N.A. | $11,500 |
| LAL | Key Bank, USA, N.A. | $18,500 |

The first payments on the above loans first became due in December 1995 after the six-month grace period following the Debtor's graduation from law school had expired. In March 1996, under Law Access's private consolidated loan program, the Debtor consolidated the Private Loans by executing a new promissory note (the "Consolidated Private Loan") in favor of Key Bank, USA, N.A. ("Key Bank"). The repayment period for the Consolidated Private Loan was set at twenty-five years. As of April 10, 1996, the outstanding balance amounted to $48,590.64, at which point Key Bank assigned the loan to The Education Resources Institute ("TERI"), a private nonprofit institution organized under the laws of Massachusetts. TERI guaranteed the Consolidated Private Loan pursuant to the Law Access Program. The Debtor defaulted under the terms of the Consolidated Private Loan, resulting in TERI's payment to the lender of its guarantee obligation. TERI is the current and final holder of this indebtedness.

Under the consolidated note, the Debtor's monthly payment for the Consolidated Private Loan is as follows:

| Beginning | Number of Payments | Monthly Payment |
|---|---|---|
| 04/10/96 | 24 | $344.03 |
| 04/10/98 | 24 | $371.15 |
| 04/10/00 | 252 | $402.17 |

As of March 1, 2001, the principal balance due and owing by the Debtor under the Consolidated Private Loan was $56,155.39 (including capitalized interest), and accrued and unpaid interest amounted to $5,429.66, for an aggregate outstanding balance of $61,585.05. Interest continues to accrue at the per diem rate of $14.25.

### B. The Debtor's Employment

Upon graduation from law school in 1995, the Debtor applied for positions both in the private and public sectors. Despite his efforts to obtain employment with a private law firm, including mailing his resume to 25 to 50 law firms, he was unsuccessful. He did, however, obtain a job at the Queens County District Attorney's Office. During 1996, the Debtor had an adjusted gross income of $32,226.00. On July 7, 1997, after two years at the District Attorney's Office, the Debtor obtained his current job at the City of New York Police Department (the "Police Department") where he continues to be employed as an Agency Attorney, Level One, assigned to the Department Advocate's Office. He prosecutes disciplinary violations for uniform and civilian members of the Police Department in internal trials. He is paid an annual salary of $47,400.00. After deduction of taxes, the Debtor receives a biweekly paycheck of $1229.00, amounting to a net monthly salary of $2458.00. Although the possibility for promotion to a supervisory position exists, the labor contract covering the Debtor's employment does not provide for an automatic annual increase in salary.

Since August 1999, the Debtor has sought employment that pays a higher salary. He has had eleven interviews, some with law firms and city agencies and others with financial services groups. He testified that he continues to look for private employment, taking active steps such as sending out two to three resumes a week for attorney positions announced in the New York Law Journal or for job openings he learns of through his friends that are lawyers. The Debtor's efforts, however, have proved unsuccessful.

### C. The Debtor's Monthly Expenses

Schedule J of the Debtor's petition lists his monthly expenses as $3311.00, an amount in excess of his monthly income. The Debtor's testimony at trial, however, suggests that his monthly expenses amount to approximately $2962.00. The $349.00 difference in monthly expenses can be attributed in part to the following revised figures: (1) a $10.00 increase in cable (from $55.00 to $65.00), (2) a $100.00 increase in food expense (from $300.00 to $400.00), (3) a $20.00 increase in laundry and dry-cleaning (from $100.00 to $120.00), (4) a $27.00 increase in entertainment expenses (from $100.00 to $127.00), (5) a $30.00 decrease in maintenance of his apartment (from $50.00 to $20.00), (6) a $200.00 decrease in medical and dental expenses resulting from the Debtor's switch to a lower-priced insurance plan (from $400.00 to $200.00), (7) a $20.00 decrease in transportation costs (from $150.00 to $130.00), and (8) a $125.00 decrease in continuing legal education expenses (from $150.00 to $25.00). Furthermore, the Debtor did not list the following additional expenses in his monthly expense schedule: banking fees of $9.00 and a beeper service for $20.00. The Debtor's testimony regarding his monthly expenses for telephone ($80.00) and rent ($746.00) was consistent with how he listed them in his petition. Finally, although the Debtor originally listed his monthly student loan payments as $1000.00, the Joint Pretrial Order indicates that the combined monthly payment on his consolidated loans is approximately $840.00.

### D. The Debtor's Medical Condition

In his first two years at law school, the Debtor received fairly low grades in courses he felt he had mastered. Frustrated and disappointed with his performance, he contemplated not finishing his legal education. At the behest of a friend with learning disabilities, the Debtor sought to be tested to find out whether he was learning disabled. In April 1994, the Debtor was diagnosed with Attention Deficit Hyper–Activity Disorder ("ADHD"). Upon subsequent testing, a neurologist confirmed the Debtor's ADHD condition, which included neurological and physiological components.

Because of his learning disabilities, both Brooklyn Law School and the New York State Board of Law Examiners provided the Debtor with special accommodations for testing. The law school provided him with a private room for exams in addition to double the normal time period to complete them. The Debtor's performance in his last year of law school showed a marked improvement when compared to his first two years. When the Debtor sat for the New York State Bar Exam, he was provided with a semiprivate room at a hotel, time and a half to complete the exam, and frequent breaks. The Debtor passed the exam.

At trial, the Debtor testified that his ADHD requires him to make special accommodations for himself at work in order to perform at his best. He has made efforts to remain focused, such as wearing earplugs and taking medication to treat his ADHD. Because each dosage alleviates his condition only three to four hours at a time, the Debtor must take more of the medication to counteract the distractions at work. Unfortunately, he does not have his own office, but rather works in a room with ten people. The absence of a distraction-free environment forces the Debtor to stay longer at work or to take work home in order to complete his assignments. As a result, for the period spanning September 1999 to September 2000, he accumulated approximately 160 hours of compensation time. While the Debtor's medical treatment has facilitated his ability to perform at work, the drugs he has been prescribed have had adverse side effects, thereby requiring him to take additional medication.

### III. Issues

The issues presented to the Court are (1) whether the Debtor's loans are dischargeable under Code § 523(a)(8), and (2) whether the Court has the equitable authority to discharge or deconsolidate a portion of the Debtor's Consolidated Private Loan or the Consolidated Federal Loan. This Court has jurisdiction over this matter and the parties pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a), (b)(1). Because this adversary proceeding seeks a determination of the dischargeability of a particular debt, it is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

### IV. Legal Standards

■ A debtor bears the burden of proof to show undue hardship under Code § 523(a)(8). *E.g., Thoms v. Educ. Credit Mgmt. Corp. (In re Thoms)*, 257 B.R. 144, 148 (Bankr.S.D.N.Y.2001); *Holzer v. Wachovia Servs., Inc. (In re Holzer)*, 33 B.R. 627, 630 (Bankr.S.D.N.Y.1983); *cf.* S.Rep. No. 95–989, at 79 (indicating that Code § 523(a)(8) "is intended to be self-executing and the lender or institution is not required to file a complaint to determine the nondischargeability of any student loan"), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5865. Under the Second Circuit's decision in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2d Cir.1987), when determining whether a student loan obligation should be discharged because repayment creates

an undue hardship, the court should consider: (1) the debtor's current level of income and expenses and whether a minimal standard of living can be maintained by the debtor if he must repay the student loans, (2) additional circumstances that might suggest that the debtor's current financial condition would likely continue for a significant portion of the repayment period, and (3) whether the debtor has made a good faith attempt to repay the student loans. *Id.* at 396.

In applying the *Brunner* test, the question arises whether a court must aggregate a debtor's student loans and determine their dischargeability as a whole, or whether a court's analysis may be conducted on a loan-by-loan basis, with the result that one of the loans may be discharged and the other excepted from discharge based upon a debtor's ability to repay one of the loans without undue hardship. A third possibility arises as to whether a court may partially discharge a single student loan obligation on the theory that the debtor can repay a portion of it without undue hardship.

■ Before this Court determines whether Code § 523(a)(8) allows the instant debts to be discharged, it must ascertain which of the aforementioned approaches provides the appropriate framework for the Court's analysis. In doing so, the Court will adhere to the principle that, "when 'the statute's language is plain, the sole function of the courts'—at least where the disposition required by the text is not absurd—'is

to enforce it according to its terms.'" *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)); *accord N.Y. State Pesticide Coalition, Inc. v. Jorling*, 874 F.2d 115, 118 (2d Cir.1989).

## A. Partial Discharge Approach

■ Courts holding that partial discharge of educational loans is an appropriate remedy have relied on one of two arguments in drawing their conclusion: (1) The statutory language of Code § 523(a)(8) permits such flexibility because of its ambiguity;[2] or (2) Code § 105(a)[3]—the basis for a bankruptcy court's broad exercise of power in administering a case—allows a court to effectuate a partial discharge, even though Code § 523(a)(8) does not expressly contemplate that result. *See Grigas v. Sallie Mae Servicing Corp. (In re Grigas)*, 252 B.R. 866, 871–72 (Bankr.D.N.H.2000) (summarizing various approaches by courts that have applied partial discharge to student loans). This Court rejects both arguments.

■ The Bankruptcy Code clearly does not permit a court to discharge in part a single student loan obligation. First, no language in Code § 523(a)(8), which refers to *"an educational benefit overpayment or loan,"* suggests that a bankruptcy court has the authority to grant partial discharge of a single loan. To read that

---

2. There are only two reported decisions in the Second Circuit where a bankruptcy court has permitted partial discharge of a student loan obligation, on the theory that the language of Code § 523(a)(8) requires a debtor to make repayment only to the extent there is no undue hardship. *Wetzel v. N.Y. State Higher Educ. Servs. Corp. (In re Wetzel)*, 213 B.R. 220, 227 (Bankr.N.D.N.Y.1996) (citing *Raim-*

*ondo v. N.Y. State Higher Educ. Servs. Corp. (In re Raimondo)*, 183 B.R. 677, 681 (Bankr. W.D.N.Y.1995)); *Raimondo*, 183 B.R. at 681.

3. Code § 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of ... title [11]." 11 U.S.C. § 105(a) (2000).

authority into the statute's language would be a gross departure from the plain meaning rule of statutory construction. *See Andresen v. Neb. Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 130 (8th Cir. BAP 1999) ("[I]f Congress had intended revision or partial discharge to be options for the court to consider under § 523(a)(8), then Congress could have expressly enumerated those options or included broader language in order to reveal that policy objective and enable the bankruptcy courts to effectuate it."); *United Student Aid Funds, Inc. v. Taylor (In re Taylor)*, 223 B.R. 747, 753 (9th Cir. BAP 1998) ("[B]ecause the plain language of § 523(a)(8) implies that only the entire debt can be discharged for undue hardship, and because Congress expressly limited the extent of a debt's discharge in other subsections of § 523, we hold that § 523(a)(8) does not authorize a partial discharge ...."); *Grigas*, 252 B.R. at 872 stating:

> Section 523(a)(8)'s language refers to a debt in its totality, and does not envision only a portion being discharged. This conclusion is strengthened by the observation that Congress knows how to allow a partial discharge when it so desires, and has done so in statutory subsections coexisting with § 523(a)(8). It is a fundamental tenet of statutory interpretation that "where Congress has failed to include language in statutes, it is presumed to be intentional when the phrase is used elsewhere in the Code."

(quoting *Taylor*, 223 B.R. at 753). Moreover, although a bankruptcy court may issue any order, process, or judgment necessary or appropriate to carry out Code provisions, the broad grant of power given to a court under Code § 105(a) does not permit it to use its equitable powers to achieve a result not contemplated by the Code, particularly where a specific section of the Code squarely addresses the issue before the court. *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir.1993); *see Viking Assocs. v. Drewes (In re Olson)*, 120 F.3d 98, 102 (8th Cir.1997); *Grigas*, 252 B.R. at 872; *see also Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."). Reading Code § 105(a) to permit partial discharge of a single student loan would run roughshod over Code § 523(a)(8). *See Grigas*, 252 B.R. at 872 ("The text of § 523(a)(8) does not allow a partial discharge, and § 105 cannot be used to rewrite such language."). Such a practice constitutes impermissible judicial activism, the sort that exceeds the scope of a bankruptcy court's equitable powers. *See id.* at 872; *Hawkins v. Buena Vista College (In re Hawkins)*, 187 B.R. 294, 301 (Bankr.N.D.Iowa 1995). Accordingly, this Court rejects the partial discharge approach.

## B. Aggregate Approach vs. Loan–by–Loan Approach

■ At first glance, nothing in the language of Code § 523(a)(8) suggests that the undue hardship exception to nondischargeability must be applied to the aggregate obligation of cumulative student loan debt: "The language of § 523(a)(8) expressly refers to *a* student loan, *an* overpayment, or *any* obligation. *The words provided in the section are clearly singular.* The Code does not refer to a debtor's sum of student loans, aggregate student loan debt, or other accumulated, consecutive, or consolidated loan obligations." *Andresen*, 232 B.R. at 136 (emphasis added). Following the logic of this argument, various courts have held that the express wording of Code § 523(a)(8) commands that a court evaluate each individual loan

obligation when conducting its undue hardship analysis.[4] *Id.* at 137; *Ledbetter v. United States Dep't of Educ. (In re Ledbetter)*, 254 B.R. 714, 717–18 (Bankr. S.D.Ohio 2000); *Grigas*, 252 B.R. at 874; *Hollister v. Univ. of N.D. (In re Hollister)*, 247 B.R. 485, 492–93 (Bankr.W.D.Okla. 2000); *see Hinkle v. Wheaton College (In re Hinkle)*, 200 B.R. 690, 693 (Bankr. W.D.Wash.1996) ("While a bankruptcy court cannot restructure the loans, there is no reason that it cannot treat each one separately for the purpose of dischargeability, if the loans have not been consolidated by agreement of the parties.").

Cases that have held the undue hardship exception to apply to the aggregate obligation of cumulative student loan debt have done so in the context of rejecting arguments that Code § 523(a)(8) allows partial discharge of student loan obligations. *E.g., Taylor*, 223 B.R. at 752–53; *Thomsen v. Dept. of Educ. (In re Thomsen)*, 234 B.R. 506, 514 (Bankr.D.Mont. 1999); *Skaggs v. Great Lakes Higher Educ. Corp. (In re Skaggs)*, 196 B.R. 865, 866–67 (Bankr.W.D.Okla.1996); *Hawkins*, 187 B.R. at 300–01. They have not considered whether the exception is applicable individually to each loan.[5] *See, e.g., id.* at 301 ("This decision is not a ruling on whether separate claims may be discharged."). The court in *Young v. PHEAA (In re Young)*, 225 B.R. 312 (Bankr.E.D.Pa.1998), however, expressly rejected a loan-by-loan approach in favor of the aggregate approach. It reasoned that, because no provision in the Code directs or suggests a principled basis for priority among educational lenders, applying the undue hardship exception to each individual loan would impliedly require an impermissible use of Code § 105(a). *See id.* at 318 ("[I]t would seem . . . that only an exercise of § 105(a) powers in contradistinction to the language of § 523(a)(8)(B) would allow this court to choose which of the Debtor's loans should be discharged and which loans should not be discharged."). Courts that have applied the loan-by-loan approach have done so by beginning their analysis with the first loan made. *E.g., Grigas*, 252 B.R. at 876; *Hollister*, 247 B.R. at 493; *Hinkle*, 200 B.R. at 693. This Court concludes that chronological order is not a principled basis for according a higher priority to one educational lender over another. Such a method for selecting loans to be excepted from discharge necessarily requires a bankruptcy court to exceed the scope of its

---

4. The Court notes that 1 U.S.C. § 1 (2000) states that, "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise[,] words importing the singular include and apply to several persons, parties, or things." While this directive makes clear that use of the singular does not exclude use of the plural, Code § 523(a)(8) does not expressly require a court to aggregate a debtor's student loans when determining dischargeability. For reasons discussed below, however, the structure of the Code requires aggregation of multiple educational loans when determining dischargeability.

5. To account for the absence of such analysis, the Bankruptcy Appellate Panel for the Eighth Circuit has speculated that "[t]he cases deal with the debt in aggregate, perhaps misled merely because multiple loans are often held by one lender, servicer or guarantor which may subtly manage to blend multiple liabilities on actually different claims into one single debt." *Andresen v. Neb. Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 134 (8th Cir. BAP 1999). *But see Skaggs v. Great Lakes Higher Educ. Corp. (In re Skaggs)*, 196 B.R. 865, 866 (Bankr.W.D.Okla.1996) (" 'Debt' is defined in section 101(12) of the Bankruptcy Code as 'liability on a claim.' Plainly understood, 'liability on a claim' encompasses the entire liability, not merely some portion of the debt or merely selected terms of repayment."). The Court believes a better explanation is that those cases presuppose that the limits of a bankruptcy court's authority preclude such an inquiry.

authority, with the result of violating one of the fundamental principles of bankruptcy imposed by the structure of the Code—equality of distribution among similarly situated creditors. *See, e.g.,* 11 U.S.C. § 726 (prescribing order of distribution of property of estate in Chapter 7 case); *id.* § 547 (2000) (permitting trustee to avoid certain prebankruptcy transfers that prefer one creditor to the detriment of others).[6] Accordingly, the Court will conduct its undue hardship analysis with regard to the aggregate of the Debtor's consolidated loans.[7]

## V. Conclusions of Law

As discussed above, the Court will determine whether repayment of the loan obligations will result in undue hardship to the Debtor pursuant to the three-part test established in *Brunner.* If the Court concludes that all three *Brunner* factors have been satisfied, it will find that undue hardship exists and discharge the student loans. *See Elmore v. Mass. Higher Educ. Assistance Corp. (In re Elmore),* 230 B.R. 22, 29 (Bankr.D.Conn.1999) (noting that failure of debtor to establish all three requirements under *Brunner* precludes undue hardship discharge). For the reasons expressed below, the Court finds that excepting the Consolidated Federal Loan and the Consolidated Private Loan from discharge will not impose an undue hardship on the Debtor.

## A. Legislative History of Code § 523(a)(8).

Code § 523(a)(8) does not enumerate factors under which a court may discharge an educational loan for undue hardship. Therefore, in order to apply its *Brunner* analysis in a manner that is proper and consistent with Congress's intent, it is appropriate for the Court to rely on legislative history to clarify what is meant by the term "undue hardship." When determining whether a student loan may be discharged, courts have referred to Congress's policy concern when it enacted Code § 523(a)(8)—that is, preventing abuse of the bankruptcy process that threatened the financial integrity of participating lenders in educational loan programs. *E.g., Cazenovia College v. Renshaw (In re Renshaw),* 222 F.3d 82, 86–88 (2d Cir.2000) (discussing legislative history of Code § 523(a)(8)); *Pa. Higher Educ. Assistance Agency v. Faish (In re Faish),* 72 F.3d 298, 302 (3d Cir.1995) (same); *Andrews University v. Merchant (In re Merchant),* 958 F.2d 738, 739–40 (6th Cir.1992) (same). That reference, however, distorts the legislative history by failing to mention that the House of Representatives advocated dischargeability of student loans in its report on the Bankruptcy Reform Act of 1978. *See* H.R.Rep. No. 95–595, at 132 (1977) (stating that House Judiciary Com-

---

6. The court in *Raimondo* reached the same conclusion, albeit for the reason that equity does not permit such differentiation. *See Raimondo,* 183 B.R. at 680 stating:

> The concept of "first in time, first in right" might apply where subsequent creditors fail to diligently protect their interests despite actual or constructive knowledge of a preexisting loan.... No statute dictates a disparity of result as among educational lenders. *Rather equity demands an identical treatment for these similarly situated creditors with respect to each of their similarly structured obligations.*

(emphasis added). While *Raimondo* holds that the Code impliedly provides for partial discharge of educational loans, *id.* at 681, this Court has rejected the partial discharge approach for the reasons discussed above.

7. The Court notes that it would be impermissible to look at the original notes executed by the Debtor since consolidation involves repayment of any original loans and the attendant execution of a new, single loan. Resurrection of the original notes would certainly be beyond the scope of the Court's equitable powers.

mittee rejected amendment to make educational loans nondischargeable), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6093. Noting that evidence of abuse of the bankruptcy process by debtors with educational loans was overstated, the House referred to a General Accounting Office report which found that less than one-percent of all matured educational loans were discharged in bankruptcy. *Id.* at 133, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6094. The House concluded that "abuses ha[d] not been significant enough to warrant special treatment for educational debts," and that the proper remedy for such abuses rested with the educational loan programs and not the Bankruptcy Code:

> [I]f the loans are granted too freely and that is what is causing the increase in bankruptcies, then the problem is a general problem, not a bankruptcy problem. The loan program should be tightened, or collection efforts should be increased. If neither of those alternatives is acceptable, then the loan programs should be viewed as general social legislation that has an associated cost. It is inappropriate to view the program as social legislation when granting the loans, but strictly as business when attempting to collect. Such inconsistency does not square with general bankruptcy policy.

*Id.* at 134, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6095.

 It is apparent from the debate surrounding enactment of Code § 523(a)(8) that the section "represents a compromise between the House bill and the Senate amendment regarding educational loans." 124 Cong. Rec. S33,998 (1978) (statement of Sen. De Concini). Bankruptcy courts therefore should not read the term "undue hardship" as they stringently have, with the thought that the design underlying the overall statutory scheme of Code § 523(a)(8) is to curb debtor abuse. Code

§ 523(a)(8) creates a rebuttable presumption that certain educational loans are nondischargeable, thereby suggesting that an educational lender's interest in repayment trumps a debtor's interest in a fresh start. *Renshaw,* 222 F.3d at 87; *Merchant,* 958 F.2d at 740. Accordingly, undue hardship analysis requires a bankruptcy court "to decide how much personal sacrifice society expects from individuals who accepted the benefits of guaranteed student loans but who have not obtained the financial rewards they had expected to receive as a result of their educational expenditures." 4 Collier on Bankruptcy ¶ 523.14, at 523–98 (Lawrence P. King ed., 15th rev. ed.2001).

## B. Application of the *Brunner* Test to the Debtor.

The Court finds that the Debtor has satisfied the second and third factors of the *Brunner* test. However, the problematic nature of the Court determining that repayment of the loans will cause the Debtor undue hardship stems from the first *Brunner* factor. In view of that, the Court will conduct its *Brunner* analysis by beginning with the second and third prongs and concluding with the first prong.

### 1. The Second Brunner *Factor.*

 The second prong of the *Brunner* test requires the Debtor to show that there are additional circumstances suggesting that his current financial condition will likely continue for a significant portion of the repayment period of his educational loans. *Brunner,* 831 F.2d at 396. As previously stated by this Court,

> [t]he type of 'additional circumstance' that would affect the debtor's continuing ability to repay would be a circumstance that impacted on the debtor's future earning potential but which was either not present when the debtor applied for

the loans or has since been exacerbated. Otherwise, the debtor could have calculated that factor into [his] cost-benefit analysis at the time the debtor obtained the loan.

*Thoms,* 257 B.R. at 149. The presence of circumstances indicating the persistence of a debtor's financial condition "more reliably guarantees that the hardship presented is 'undue.' " *Brunner,* 831 F.2d at 396.

The Court finds that the Debtor's future earning potential is limited by his ADHD. Initially, the Debtor was able to improve his financial situation by obtaining higher-paying employment with the Police Department. The Debtor's repeated efforts at obtaining employment in the private sector, however, have failed. Moreover, the Court agrees with the Debtor's assessment that, given the manner in which his medical condition interferes with his ability to work long hours at a desk, his abilities are not well suited to the hourly demands placed on associates in larger law firms that pay high salaries. It is also not clear that it would be advantageous for the Debtor to obtain employment in a small law firm since such employment would probably not have a health plan as beneficial as the one from which he currently benefits. The Court finds it significant that, because the Debtor discovered his learning disability in his second year of law school, he did not have an opportunity to evaluate what effect ADHD would have on his ability to repay his loans when he first obtained them. In all probability, the Debtor's current financial position will continue for the foreseeable future as he has secured the highest-paying job he is likely to have. The Court concludes that the Debtor has satisfied the second *Brunner* factor.

### 2. *The Third* Brunner *Factor.*

 Under the third prong of the *Brunner* test, a debtor must show that he has made a good faith attempt to repay his student loan obligations. *Brunner,* 831 F.2d at 396. Relevant factors to such an inquiry include (1) actual payments made on the loans and (2) attempts by the debtor to seek alternative remedies to discharge, such as deferment of payment. *Thoms,* 257 B.R. at 149 (citing *Brunner,* 831 F.2d at 397); *see also Markley v. Educ. Credit Mgmt. Corp. (In re Markley),* 236 B.R. 242, 248 (Bankr.N.D.Ohio 1999) (noting that, in applying third prong of *Brunner* test, "[f]actors to be considered include the number of payments made by the debtor, the debtor's attempt to negotiate with the lender, the proportion of loans to total debt, and possible abuse of the bankruptcy process"). A debtor must also establish that he has made "efforts 'to maximize income and minimize expenses.' " *Thoms,* 257 B.R. at 149 (quoting *Elmore,* 230 B.R. at 27). Finally, a debtor may not avail himself of Code § 523(a)(8) if he is responsible for causing the undue hardship. *See id.* ("[T]o establish good faith, the default cannot stem from the debtor's willful conduct or the debtor's neglect. Rather it must result from factors beyond the debtor's reasonable control." (citing *Elmore,* 230 B.R. at 27)).

 Most of the evidence presented to the Court supports the Debtor's contention that he has made a good faith effort to repay his educational loans. He consolidated his loans to lower his monthly payments. Although the Debtor did not make any payments on his Federal Consolidated Loan, he obtained three one-year forbearances and therefore had no obligation to make payments prior to filing his petition. The Debtor testified that he made approximately 22 payments amounting to $10,000 on the Private Consolidated Loan and continued to make payments up until one

month prior to filing for bankruptcy. As discussed above in the Court's analysis of the second *Brunner* factor, the Debtor has obtained employment that corresponds with his law degree, thereby fulfilling his obligation to maximize his income. Finally, TERI's argument that the Debtor seeks to abuse the bankruptcy process, as evidenced by the fact that his student loans comprise approximately 86% of his total debt,[8] is misguided. While courts have noted that the proportion of student loans to total scheduled debt is a relevant factor when determining whether a debtor has made a showing of good faith, *e.g. Markley*, 236 B.R. at 248; *Harris v. Pa. Higher Educ. Assistance Agency (In re Harris)*, 103 B.R. 79, 82 (Bankr.W.D.N.Y. 1989), none of the circumstances in this case suggests that the Debtor seeks to have his educational loans discharged before embarking on a lucrative career. Rather, the evidence points to the contrary—that the Debtor's current financial position mirrors his future earning potential. Moreover, the Debtor did not seek a discharge of his loans until four years after he graduated law school, further indicating that he has not exploited the Code as a means of shirking his financial obligations. The only evidence (as discussed below) that might preclude the Court from finding a good faith effort by the Debtor to repay his loans is that he has not sought to minimize his expenses. All other evidence, however, outweighs this fact and supports a finding to the contrary. The Court concludes that the Debtor has made a good faith effort to repay his loans.

*3. The First* Brunner *Factor.*

The first prong of the *Brunner* test requires a debtor to show that, given the debtor's current level of income and expenses, a minimal standard of living cannot be maintained if the debtor is forced to repay his student loans. *Brunner*, 831 F.2d at 396. The minimal standard of living factor has been interpreted to require a showing beyond significant forbearance in personal and financial matters or beyond a restricted budget. *Thoms*, 257 B.R. at 148. Such forbearance, however, does not require the debtor to live at or below the poverty level. *See Elmore*, 230 B.R. at 26. In the end, a Court must "examine current income and expenses and determine, through the application of common sense, a minimal standard of living level which is sensitive to the particular circumstances of each case." *Id.; see also* 4 Collier on Bankruptcy, *supra*, ¶ 523.14, at 523–98 (noting that each court must "apply its own intuitive sense of what is a 'minimal standard' of living" when evaluating undue hardship). Although it is not the Court's province to impose a standard of living upon the Debtor or to direct the manner in which he formulates his budget, the Court will nonetheless review the reasonableness of the Debtor's budget—particularly the allocation of projected expenses in relation to projected income—as it determines his capability to pay the instant obligations without undue hardship.

While the Court appreciates that the Debtor's financial rewards are not commensurate with his educational expenditures, the Court views some of the Debtor's expenses as excessive in light of the sacrifice expected of an individual to repay his student loan obligations—specifically, the Debtor's monthly expenses regarding (1) communication, (2) cable, (3) food, (4) clothing, (5) laundry and dry-cleaning, (6) transportation, (7) recreation, and (8) certain medical expenses. The Debtor's

---

8. In Schedule F of the Debtor's petition, the Debtor listed the total amount of his unsecured debt as $137,892.66 and his outstanding loan obligation as $118,500.00.

monthly telephone expense of $80.00 could be significantly reduced given the prevalence of inexpensive cell phone contracts and long-distance calling plans. In addition, while the Debtor currently pays $20.00 per month to have a beeper so he may be contacted at work where he does not have a private line, he could eliminate this expense and simultaneously reduce his monthly telephone expense by obtaining a cell phone to use at all times, thereby eliminating the need for a landline telephone at home. The Debtor has allocated $65.00 per month for cable television that includes two premium channels, an expense that could be limited to basic cable service. The Debtor testified that he spends $400.00 per month on food, the result of ordering dinner several nights a week and never bringing lunch to work. Clearly, it would be a more cost-effective alternative for the Debtor to prepare his own meals. His monthly clothing expense of $150.00 amounts to an annual budget of $1800.00 which is excessive when one considers that his wardrobe comprising of suits and dress shirts is partially, if not wholly, complete. He allocates $120.00 per month for laundry and dry-cleaning, which includes use of a laundry service. Were the Debtor to wash most of his clothing at a self-service laundry, he would save significantly. The Debtor spends at least $130.00 a month on transportation despite the fact that he has unlimited use of a month-long Metrocard he purchases for $63.00 with pretax dollars. He pays $50.00 a month for a fitness club membership when the Police Department has a gym available to the Debtor free of charge. He also spends in excess of $50.00 a month on newspapers and periodicals that are readily available at the New York Public Library or one of its many branches. Finally, from the testimony at trial, the Court finds that the Debtor's monthly medical expenses of $200.00 primarily stem from his psychological treatment for ADHD. The Debtor testified that, aside from his neurologist which he visits once or twice a year, all of his other doctors participate in his insurance plan. It appears reasonable to conclude that the Debtor's carrier currently provides for an adequate level of counseling to manage and monitor his condition. Any out-of-pocket expenses incurred by the Debtor with regard to such treatment are discretionary. By not choosing to forego such treatment, the Debtor willingly limits his budget.

Under these circumstances, the Debtor has not met his burden of proof with respect to the first *Brunner* factor. Although the Debtor currently endures a negative monthly cash flow, he has not persuaded the Court that his budget is reasonable—especially in light of his admission on cross-examination that he could diminish certain monthly expenses. The absence of a reasonable budget precludes the Court from finding that the Debtor lacks excess funds such that he could not maintain a minimal standard of living if required to repay his loans. Rather, his expenditures confirm that he lives a comfortable lifestyle, one that is above his means and that does not evince efforts to minimize certain discretionary expenses. It is the Court's view that the Debtor has ample room to rebudget his finances. The Court therefore concludes that the Debtor has failed to show that he cannot maintain a minimal standard of living absent a discharge of his educational loans.

## VI. Conclusion

Because the Debtor failed to meet his burden to establish all three elements of the *Brunner* test, the Court holds that both of the Debtor's loans are nondischargeable pursuant to Code § 523(a)(8). The Court notes that both ECMC and TERI have indicated their willingness to help the Debtor restructure his monthly

payments to accommodate his financial situation. Should the Debtor find repayment unmanageable after restructuring his loan obligations and minimizing his expenses, he may seek whatever further relief the Code affords him. The Debtor's motion is DENIED.

Settle order. The order shall include a date upon which the Debtor's loan payments should recommence.