In re Donald P. ELMORE, June C. Elmore, Debtors.

June C. Elmore, Plaintiff,

v.

Massachusetts Higher Education Assistance Corp. d/b/a American Student Assistance, Defendant.

Bankruptcy No. 96–33208.
Adversary No. 97–3003.

United States Bankruptcy Court, D. Connecticut.

Feb. 26, 1999.

permit the debtor the opportunity to obtain a stay before the Bankruptcy Appellate Panel. *See* Rule 8005, F.R.Bankr.P.

Eugene S. Melchionne, Waterbury, Connecticut, for Plaintiff.

John Ullian, Braintree, Massachusetts, for Defendant.

## MEMORANDUM OF DECISION ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT UNDER SECTION 523(a)(8)(B)

ALBERT S. DABROWSKI, Bankruptcy Judge.

### I. INTRODUCTION

In this adversary proceeding the Debtor–Plaintiff, June C. Elmore, a/k/a June Colber Elmore (hereafter "Mrs. Elmore"), calls upon the Court to determine that certain edu-

cational loans are dischargeable upon a claim of "undue hardship" as that term is used in Bankruptcy Code § 523(a)(8)(B). Preliminarily, the Court must address the dispositive effect, if any, the current income of Donald P. Elmore (hereafter "Mr. Elmore"), the codebtor and spouse of Mrs. Elmore, bears upon the final decision in this case. For the reasons that follow, this Court concludes that Mr. Elmore's current income should be included in the calculus to determine "undue hardship" in this case, and consequently, that the hardship presented by the facts of this case is not "undue". Accordingly, the educational debt in question is nondischargeable.

## II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant matter by virtue of 28 U.S.C. § 1334(B); and this Court derives its authority to hear and determine this proceeding on reference from the District Court pursuant to 28 U.S.C. § 157(a)(b)(1). This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(1).

## III. PROCEDURAL BACKGROUND

On September 25, 1996, a joint voluntary petition under Chapter 7 of the Bankruptcy Code was filed by Mr. and Mrs. Elmore. The Debtors scheduled $36,769.50 in liabilities, $3,351.79 in current monthly expenditures, including $212.00 allocated to "Student Loan" repayment, see Schedule J, and $2,659.81 as their total combined net monthly income. See Schedule I. On January 6, 1997, Mrs. Elmore initiated the instant adversary proceeding through the filing of a Complaint to Determine the Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(8) (hereafter the "Complaint"). On January 7, 1997, an Order of Discharge was entered by the Clerk, and on February 10, 1997, Sallie Mae [1] filed a Proof of Claim in the Bankruptcy Case. The Proof of Claim asserted, as a basis for the claim, "money loaned", and

listed an unsecured nonpriority claim in the total amount of $16,753.20.

After due notice a trial on the Complaint was conducted on July 8, 1997, at which time the Court heard the testimony of the joint Debtors and considered the arguments of counsel. Following the Court's receipt of post-trial briefs, the proceeding was taken under advisement. Having now reviewed the entire record in this case the Court renders this Memorandum of Decision.

## IV. FACTUAL BACKGROUND

To enable her to pursue a Masters Degree at Boston University Mrs. Elmore obtained three (3) Stafford Loans, guaranteed by the Massachusetts Higher Education Assistance Corporation, d/b/a American Student Assistance (hereinafter the "Defendant"). The loans were disbursed as follows:

a) $7,500.00 on November 2, 1990,

b) $7,500.00 on September 11, 1991, and

c) $2,520.00 on June 17, 1992.

(Hereafter referred to collectively as, the "Loans").

Mrs. Elmore completed her course of study and graduated from Boston University with a Masters Degree in Social Work in September 1993. She thereafter made payments on the Loans totaling $846.64, and received five (5) payment deferments between 1994 and 1996. At the time of the filing of the Bankruptcy petition there was owing a balance of $17,260.02 on the Loans.

The Debtors have three (3) children—two daughters, ages 15 and 12, and an 11 year old son. Prior to 1985 Mrs. Elmore's spouse was the chief, if not sole, wage-earner of the family, earning as much as $30,000 to $40,000 a year as manager of a fish company. However, Mr. Elmore lost that job in 1995 and, as a consequence, the Debtors gave up their home in Massachusetts and moved to Connecticut.

Upon arriving in Connecticut Mrs. Elmore obtained employment, and remains employed by, the State of Connecticut Department of

---

1. The Complaint named Sallie Mae as the Defendant, but simultaneously with its Answer filed February 25, 1997, the Massachusetts Higher Education Assistance Corporation, d/b/a American

Student Assistance, filed a motion to substitute itself, and remove Sallie Mae as, Defendant. The Motion was granted on March 26, 1997.

Corrections as a Psychiatric Social Worker, earning approximately $34,500 per year.[2] Just prior to the trial she received a raise resulting in an increase in her net pay of approximately $110.00 per month. In addition, pursuant to the terms of her union contract she was expecting a similar increase in 1998.

Mr. Elmore (age 55), is currently holding down three (3) part-time jobs. He works twenty (20) hours per week at the Oxford Housing Authority in the maintenance department, where he has a net take-home pay of approximately $167.00 per week. He also has a seafood business, known as "DE Distributors", which he operates on a seasonal basis and which generates, according to his testimony, just enough "to pay for his vehicle". As a third job Mr. Elmore drives a taxi cab, taking home, on average, approximately $75–$100 each week from this source. Tr. at 54.

The Debtors' combined monthly gross income is scheduled at $3,574.36, *see* Schedule I, or approximately 42,900.00 per year. The Elmore's *actual* combined gross annual income at the time of the hearing, according to their testimony, was greater than $45,000.00. While the Debtors' combined monthly income as listed on Schedule I is $2,659.81 ("take home"), Mr. and Mrs. Elmore's *actual* combined monthly income ("take home") is $3179.00 per month.[3] Current expenses including the monthly Loan repayment are at least $2962.00[4] but no more than $3001.79.[5] By any calculus the Debtors' combined monthly net income exceeds their combined monthly expenditures including the Loan repayment. The Debtors and their children are in reasonable health and have no extraordinary medical expenses.

## V. DISCUSSION

Bankruptcy Code Section 523(a)(8) provides, in relevant part, as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for any obligation to repay funds received as an educational benefit, scholarship or stipend, unless—

(A) such loan ... first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; or

(B) excepting such debt from discharge under this paragraph will impose an ***undue hardship*** on the debtor and the debtor's dependents. . . .

11 U.S.C. § 523(a)(8) (1996) (emphasis supplied).

Through the enactment of section 523(a)(8) Congress sought to reduce bankruptcy defaults, and thereby advance the original purposes of student loan programs, *i.e.* to assure that students attending college would have reasonable access to low interest rate loans. *See* S.Rep. No. 673, 89th Cong., 1st Sess. (1965). Congress' broad purpose was "to keep our student loan programs intact," *In*

2. At the time of the trial Mrs. Elmore had been in the employment of the State of Connecticut for over two (2) years and was taking home approximately $2,130 monthly. *See* Exhibit J ($1009.91 × 2 = $2,019.82) and Tr. at 10 (salary increase of approximately $110.00 per month).

3. Calculated by adding $2130.00 (Mrs. Elmore's monthly net income, *see* footnote 2, *supra*) plus Mr. Elmore's net from the Oxford Housing Authority ($724.00 per month, Tr. at 50) and his average taxi cab income of $325.00 per month (using the lower range—$75.00 to $100.00 weekly—of his testimony as to that income, Tr. at 54) ($2130.00 + 724 + 325 = $3179.00).

4. Calculated by adding the Mrs. Elmore's estimate of current monthly expenditures of "approximately 2750.00", Post-trial Memorandum at page 3, plus the monthly student repayment figure of $212.00 ($2750.00 + 212 = $2962).

5. The Debtors originally scheduled $3351.79 for monthly expenditures. However, groceries and food expenses have been reduced approximately $100.00, scheduled medical expenses of $200.00 have been nearly eliminated due to newly obtained health insurance coverage, and educational expenses of $50.00 were overestimated on the petition date. *See* Plaintiff's Post-trial Memorandum at page 2.

re *Karben,* 201 B.R. 681, 684 (Bankr.S.D.N.Y. 1996) (*quoting* remarks of *Representative Ertel,* 124 Cong.Rec. 1791–92), thereby benefitting future students whose education would not be possible without a "continued recycling of funds." *Id.*

## A. Analysis of Undue Hardship under Section 523(a)(8)(B).

### 1. Burden of proof.

■ As a preliminary matter the Court notes that the burden of proof on the issue of *undue hardship* is on the Debtor. *In re Stein,* 218 B.R. 281, 286–87 (Bankr.D.Conn. 1998). Neither Bankruptcy Code Section 523 nor the Federal Rules of Bankruptcy Procedure provide an allocation of the burden of proof in dischargeability proceedings. Most courts, however, guided by the construction of Section 523, its legislative history and the evolving body of court decisions on that subject have determined that the burden of proof on this issue is on the debtor. *See, e.g., In re Keenan,* 53 B.R. 913, 916 (Bankr. D.Conn.1985); *In re Lindberg,* 170 B.R. 462, 464 (Bankr.D.Kan.1994); *Mathews v. Higher Education Assistance Foundation and United Department of Education, et al.,* 166 B.R. 940, 943 (Bankr.D.Kan.1994); *In re Foreman,* 119 B.R. 584, 586 (Bankr.S.D.Ohio 1990).

### 2. The *Brunner* standards.

■ In the Second Circuit the existence of "undue hardship" must be determined according to the three-part test announced in *Brunner v. New York State Higher Education Services Corp.,* 831 F.2d 395 (1987).[6] According to Brunner, in order to prove undue hardship, a debtor must show by a preponderance of the evidence that:

1) she cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loans;

2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period; and

3) she has made good faith efforts to repay the loans.

*Id.* at 396.

### a. Maintenance of minimal standard of living.

■ The first element of *Brunner* requires a showing that the debtor "cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans." This minimal standard of living test "requires more than a showing of tight finances," *Pennsylvania Higher Education Assistance Agency v. Faish,* 72 F.3d 298, 306 (3rd Cir.1995), and is not met "merely because repayment of the borrowed funds would require some major personal and financial sacrifices." *Id.* On the other hand, the test does not require a debtor to demonstrate that repayment of the loan would cause him and his family to live at or below the poverty level. *See In re Correll,* 105 B.R. 302, 306 (Bankr.W.D.Pa.1989).

■ Distilled to its essence, this test requires the Court to examine current income and expenses and determine, through the application of common sense, a minimal standard of living level which is sensitive to the particular circumstances of each case. In exercising discretion in this regard, courts have found household incomes much less than the Debtors sufficient to maintain a minimal standard of living. *E.g. Halverson v. Pennsylvania Higher Education Assistance Agency et al.,* 189 B.R. 840, 844 (Bankr.N.D.Ala.1995) (finding that "a combined total net income of approximately $21,-000 per year for a family of three must be above a 'minimal' standard of living....").

---

**6.** This three-part test has been utilized by courts in other circuits as well. *E.g. In re Roberson,* 999 F.2d 1132 (7th Cir.1993); *In re Mayer,* 198 B.R. 116 (Bankr.E.D.Pa.1996); *In re Coveney,* 192 B.R. 140 (Bankr.W.D.Texas 1996); *In re Windland,* 201 B.R. 178 (Bankr.N.D.Ohio 1996); *In re*

*Dennehy,* 201 B.R. 1008 (Bankr.N.D.Fla.1996); *In re Hawkins,* 187 B.R. 294 (Bankr.N.D.Iowa 1995); *and Commonwealth of Virginia State Education Assistance Authority v. Dillon,* 189 B.R. 382 (W.D.Va.1995).

### b. Circumstances indicating persistence of condition.

If the Court finds a sub-minimal standard of living, it must then assess the likely persistence of that state of affairs. This second prong of the *Brunner* test focuses on the clear Congressional intent behind Section 523(a)(8)—to make the discharge of student loans much more difficult than that of other non-excepted debt. *Brunner, supra,* 831 F.2d at 396. Requiring "additional circumstances . . . indicating that this state of affairs [inability to pay and maintain a minimal standard of living] is likely to persist for a significant portion of the repayment period more reliably guarantees that the hardship presented is 'undue.' " *Id.*

### c. Good faith effort.

 The third prong of the *Brunner* analysis—whether the debtor has made a *good faith* effort to repay her loan—recognizes that *undue hardship* "encompasses a notion that the debtor may not wilfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.' " *Matter of Roberson,* 999 F.2d 1132, 1136 (7th Cir.1993). Moreover, upon receiving the taxpayer-supported loan and consequent educational benefit, a debtor assumes an obligation to make a *good faith* attempt at full repayment as "measured by his or her efforts to obtain employment, maximize income and minimize expenses," *Id.,* and to undertake all other reasonable efforts to insure repayment. *See Brunner, supra,* 831 F.2d at 397.

### B. Applicability of Section 523(a)(8)(B) vis-a-vis a Non–Petitioning Spouse's Income

 In the present case the Mrs. Elmore's monthly net income of $2130.00 falls approximately $800.00 short of the her family's monthly expenditures of between $2962.00 and $3001.79. However, Mr. Elmore's income, if included in this calculus, provides a cushion as high as $175.00 per month.[7]

The Bankruptcy Code is silent on the issue of whether a spouse's income is to be considered in determining "undue hardship". This Court finds some guidance in the existing body of case law dealing with the issue of a *non-debtor* spouse's income relative to, *inter alia,* Chapter 13 plan confirmation,[8] and dismissal of Chapter 7 cases due to substantial abuse.[9] In a case such as the one at bar, where both Mrs. and Mr. Elmore as co-debtors have brought themselves within the purview of this Court, that is, where both have sought protection under the Bankruptcy Code, and where joint schedules have been offered into evidence (as modified by the Debtors' testimony), the Court is bound to consider the income (and expenses) of both Debtors in determining "undue hardship" in the context of this dischargeability action. Despite recognizing its potentially fatal effect, *see* footnote 7, supra, Mrs. Elmore's counsel now concedes the appropriateness of this inclusion, stating "[i]t is appropriate for the Court to . . . take into account the *poten-*

---

7. The significance of including Mr. Elmore's income was recognized by Mrs. Elmore's counsel at trial. At the conclusion of the trial, the Court set a briefing schedule and directed the parties attention to "[t]he extent to which the Court should consider relevant . . . the husband's income." Tr. at 69. Counsel for Mrs. Elmore responded "I think that's the issue . . . it's an important one because it could make this case go either way." *Id.*

8. Pursuant to the provisions of Section 1325(b)(2), courts have held that the non-debtor spouse's income should be considered when applying the "disposable income" test in determining a particular debtor's ability to pay. This test lends itself to applicability because it "enables the court to determine what funds are available to the debtor to pay the obligation after deducting "reasonably necessary" expenses". *In re*

*Dressler,* 194 B.R. 290, 304 (Bankr.D.R.I.1996), citing *In re Cardillo,* 170 B.R. 490, 491 (Bankr. D.N.H.1994). See also *In re Jodoin,* 209 B.R. 132, 142 (9th Cir. BAP 1997).

9. In this vein, one court analogized the substantial abuse inquiry under 11 U.S.C. Section 707(b) to Chapter 13 plan confirmation and "undue hardship" situations. *See In the Matter of Budd Milton Strong,* 84 B.R. 541 (Bankr.N.D.Ind. 1988), where the court offered that "[A]ll three necessitate a determination of how much disposable income, after subtracting reasonable and necessary expenses, will be available to a given debtor." *Id.* at 543. The *Strong* court, citing *in re Kern,* 40 B.R. 26, (Bankr.S.D.N.Y.1984), further urged that "[T]here is no justification for ignoring the impact of a non-petitioning spouse's income on a debtor's financial situation".

*tial* income from her husband, now *and in the future.* The *Brunner* test requires that all sources of income be considered." (emphasis supplied). Plaintiff's Post-trial Memorandum at 2.[10]

## C. Application of Section 523(a)(8)(B) (Undue Hardship) to the Debtor.

■ Against this background the Court now turns to analyze the factual circumstances presented by Mrs. Elmore in this case. The determination of whether or not Mrs. Elmore can maintain, based on combined current income and expenses, a "minimal standard of living" if forced to repay the Loan begins, and ends, with the fact that she enjoys an annual family income over $45,000.00. The Court takes judicial notice of the 1997 Federal Poverty Level Guidelines which establish a poverty level for a family of five at $18,770.[11] Mrs. Elmore's income alone is almost twice that level. The Debtors' combined income is between two and three times that amount. An annual income of $45,000.00 may not afford a family of five a lavish lifestyle, but in any case permits a family of five with reasonable expenses—and clearly permits this particular family with its expenses—to live above a minimal standard. Mrs. Elmore can easily maintain, based on present income and expenses, a minimal standard of living for herself and her family if forced to repay the Loans. In light of the foregoing, this Court concludes that the Mrs. Elmore has failed to satisfy the first element of the *Brunner* test.

■ Even if Mrs. Elmore satisfied the minimal standard of living test, she would not qualify for a discharge without satisfying each of the remaining two *Brunner* prongs. She must establish under the second prong of the *Brunner* test that "additional circumstances exist indicating that this state of affairs [a sub-minimal standard of living] is

likely to persist for a significant portion of the repayment period." *Brunner, supra,* 831 F.2d at 396. Mrs. Elmore's somewhat pessimistic outlook regarding her present financial state of affairs and her future earning potential does not square with her qualifications, work experience, and/or her Masters Degree. Mrs. Elmore easily obtained employment with the State of Connecticut, initially earning $34,500.00 per year. Pursuant to a union contract she has received, and is likely to continue to receive on an annual basis, salary increases. Accordingly, even were this Court to determine that the her financial situation precluded her from maintaining a minimal standard of living if forced to repay the Loans, there are no additional circumstances to indicate that this state of affairs will persist. The circumstances suggest the opposite—that her financial condition, when assessed by disposable income, will gradually improve, and her potential for continued future employment with union-negotiated wage increases is positive.[12]

■ The third prong of *Brunner,* requiring Mrs. Elmore to establish *good faith* efforts to repay the Loans, was also placed in issue. By virtue of her advanced degree and the employment achieved as a direct result thereof, Mrs. Elmore, as she anticipated when she took out the Loans, substantially benefitted from, and continues to enjoy the benefit of, those Loans. While she obtained employment commensurate with her advanced degree, thereby fulfilling her obligation to maximize income, there was no apparent pre-petition effort to minimize expenses. The post-petition minimization of food and educational expense, *see* footnote 5, supra, was an obvious tactical reduction influenced by the *Brunner* parameters and is not reflective of a "good faith" pre-petition effort to minimize expenses. Between 1994 and 1996 she made only four(4) Loan payments of

---

10. Notwithstanding this concession, the Court need only, and has only, considered Mr. Elmore's *present* income in determining the first prong of the "undue hardship" test under *Brunner in this case.* In view of Mr. Elmore's present underemployment, consideration of his *future* income would only serve to reinforce a finding unfavorable to Mrs. Elmore under *Brunner's* second prong.

11. *See* Poverty Guidelines of the Department of Health and Human Services, published March 10, 1997.

12. As previously noted, *see* footnote 12, the Court reaches this conclusion without consideration of Mr. Elmore's prospects for future employment.

approximately $212.00 each [13] and further benefitted from five payment deferments periods. Four payments, or payments totaling $846.64, under the circumstances of this case is not a "reasonable effort". Accordingly, Mrs. Elmore has failed to convince this Court that she made all reasonable efforts to make or insure repayment of these educational loans, and, therefore, has failed to meet her burden of establishing a "good faith" effort at repayment under *Brunner*.

### SUMMARY AND CONCLUSION

Mrs. Elmore can easily maintain, based on her and her spouse's current income and expenses, a minimal standard of living for herself and her family if compelled to repay the educational debt she incurred to fund her Master's Degree. In addition, during the repayment period her disposable income should increase, reflecting a likelihood for an improved financial state of affairs during that period. Finally, Mrs. Elmore has failed to establish at "good faith" effort at repayment. Failure to meet her burden to establish even one of *Brunner's* three requirements is fatal to Mrs. Elmore's request for a determination of dischargeability. Accordingly, having determined that excepting the Mrs. Elmore's educational loan debt from discharge imposes no "undue hardship" on her, her spouse, or her dependents, this Court finds that the entire amount of the Debtor's educational loan debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(8)(B). A separate Judgment shall issue this same date.

### JUDGMENT

This adversary proceeding having come on for trial before this Court; and the Court having received and reviewed the evidence, and having received and considered arguments of the parties thereon; and having this day issued its Memorandum of Decision on Complaint to Determine Dischargeability of Debt Under Section 523(a)(8), in accordance with which it is hereby

**ORDERED** that judgment shall enter in this adversary proceeding in favor of the

Defendant. The Debtor–Plaintiff's student loan debt, as described in his Complaint, is **nondischargeable** pursuant to Section 523(a)(8)(B).

---

13. The Court presumes four payments of approximately $212.00 each were made. (The total paid ($846.64) divided by 4 equals $211.66—the amount of the Loan monthly payment allocation of $212.00).