323 B.R. 111 (2005)
In re Carmela L. DEGUEVARA Debtor.
Carmela L. DeGuevara, Plaintiff,
v.
Educational Credit Management Corporation, Defendant.
Bankruptcy No. 02-42736(ALG), Adversary No. 02-08090.
United States Bankruptcy Court, S.D. New York.
March 31, 2005.
*112 *113 Wilkie Farr & Gallagher LLP, By Marc Abrams, Esq, Terence K. McLaughlin, Esq., New York City, Pro Bono for the Plaintiff/Debtor.
Pullman & Comley, LLC, By Elizabeth J. Austin, Esq., Gwen P. Weisberg. Esq., Bridgeport, CT, for the Defendant.

MEMORANDUM OF DECISION
ALLAN L. GROPPER, Bankruptcy Judge.
This is an adversary proceeding filed by Jane Doe (the "Debtor") seeking to discharge student loans managed by the defendant Educational Credit Management Corporation ("ECMC"). After a one-day trial and extensive briefing by both parties, the Court makes the following findings of fact and conclusions of law. It finds that the Debtor has demonstrated "undue hardship" pursuant to § 523(a)(8) of the Bankruptcy Code and that her student loans can be discharged.

FACTS
At the time of trial, the Debtor was 46 years old. She is a native of Peru. Upon arriving in America, she settled in Los Angeles, California, where she lived with her two brothers, James and John. In 1987, the Debtor obtained a position as a secretary with the Northrop Corporation at an initial salary of $29,000 per year. Within two years, she was promoted to the finance department and given the title of "analyst."
The Debtor's College Education
While working at the Northrop Corporation, the Debtor enrolled as a part-time evening student at the El Camino College, a two-year college located in Torrance, California. After one year of classes, the Debtor withdrew from school as a result of two medical emergencies involving her brothers. In the first week of December 1998, the Debtor's brother, John, was hospitalized with a nervous breakdown. One week later, the Debtor's other brother, James, was in a car accident and suffered serious brain damage. John subsequently returned to Peru; James remained in California. The Debtor testified that she *114 continued to support financially both John and James following the accident.
In 1992, the Northrop Corporation laid the Debtor off. She briefly sought another position, but was unable to find employment and, instead, enrolled as a full-time student at the El Camino College. After one year at El Camino, the Debtor transferred to California State University  Long Beach, a four-year college. In 1996, the Debtor received a Bachelor's degree in Business Administration. Between 1993 and 1996, the Debtor took out twelve federally insured student loans. As further discussed below, over the years, the Debtor repaid $13,024 on her student loans, but at the time of trial, she still owed approximately $37,000, or about $7,000 more than she originally borrowed.
The Debtor's Post-College Employment History
In 1997, the Debtor moved to New York City. She worked part-time for over six months while searching for permanent employment. The Debtor finally obtained a position with Morgan Stanley as an administrative assistant in the Equity Research Department. Her initial salary was $37,000 per year. She advanced at Morgan Stanley and within two years was moved to the Operations Department and given the position of "analyst," where she received almost $50,000 per year. The Debtor remained at Morgan Stanley until she was laid off in late 2001. She has since had trouble securing full-time employment.
The Debtor testified credibly that in the two years between losing her job at Morgan Stanley and trial she engaged in an aggressive attempt to secure new permanent employment, sending out over 3,000 resumes in response to job announcements and, on an unsolicited basis, to various employment agencies and "headhunters." The Debtor also testified that an important part of her search for permanent employment is the Internet. She visits job search boards frequently throughout the week. Despite this effort, during the first 16 months after losing her job at Morgan Stanley, the Debtor obtained only part-time employment through various "temp" agencies. These jobs paid little, offered no medical benefits, and provided no guarantees of continued employment. The Debtor testified that an agency would call potential employees in the order they appeared on a list and if the individual did not respond immediately, the agency would simply move down the list to the next potential employee.
In April of 2003, after over a year of intermittent employment, the Debtor obtained full-time employment with a small Latin American firm. There she earns an annual gross income of approximately $36,000 as an administrative assistant; however, she receives no medical or other benefits. She was at the firm at the time of trial, but her employment there was not likely to continue. As she testified, this employment was temporary as the firm was preparing to wind down and cease operations, again leaving the Debtor unemployed or working at temporary jobs.
The Debtor lives very modestly with absolutely no luxuries. She needs dental care that she cannot afford and is using an outdated prescription for corrective lenses because she cannot afford a new one. She used her small Morgan Stanley retirement plan for living expenses during her period of unemployment and has no savings. Her utility service was twice shut off for default in payment.
The Debtor testified that her mother lives with her most of the year and has done so for several years. At the time of trial, her mother was temporarily living with a sister in California, but the Debtor's testimony that her mother is dependent on *115 her is supported by the record, as further discussed below.
The Parties' Proposed Budgets
At trial, the Debtor entered into evidence the following list of monthly expenses, which includes expenses for herself and her mother:


Rent $1,237.48
Medical Expenses 1044.26
Food/Grocery 400.00
Utilities 120.00
Transportation (Subway) 70.00
Laundry 66.23
Cellular Phone 49.64
Cable Television 44.54
Telephone (Land line) 34.20
Transportation For Her Mother 30.00
Internet 21.95
Dry-cleaning 20.00
International Calling Card 20.00
Emergency 100.00
Total: $3,358.30

The Debtor's expenses for food, laundry and emergency include amounts she pays on behalf of her mother, and her medical expenses can be further broken down to $395.16 for the Debtor, $659.62 for the Debtor's mother and $15.49 for the Debtor's brother. At trial, the Debtor testified further that she does not any longer purchase an international calling card or subscribe to cable, thus reducing her monthly budget to $3,293.76. The Debtor's present monthly income is $2,340, leaving the Debtor with a monthly deficit of $953.76.
In its Post-Trial Memorandum, ECMC submitted what can best be termed a counter-budget:


Rent $1,237.48
Medical Expenses 200.00
Food/Grocery 200.00
Utilities 120.00
Transportation (Subway) 70.00
Laundry 33.00
Cellular Phone 49.64
Cable Television 0.00
Telephone (Land line) 34.20
Transportation For Her Mother 0.00
Internet 21.95
Dry-cleaning 20.00
International Calling Card 0.00
Emergency 50.00
Total: $2,086.64

This budget eliminates all items in the Debtor's budget for her mother and reduces the amount the Debtor pays for her own medical needs by over $100. Under ECMC's budget, the Debtor would have a monthly surplus of $253.36 that could be applied to her student loans.

Discussion
Section 523(a)(8) of the Bankruptcy Code governs the dischargeability of a student loan.[1] Section 523(a)(8) states in pertinent part that a debtor is not granted a discharge of any debt "for an educational . . . loan made, insured or guaranteed by a governmental unit . . . unless excepting such debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents." The Bankruptcy Code is silent as to what constitutes "undue hardship."
In Brunner v. New York State Higher Education Services Corp., 831 F.2d 395 (2d Cir.1987), the Second Circuit in a per curiam opinion delineated a three-part test for defining undue hardship that is controlling here and has been adopted by a majority of the Circuits:
(1) that the debtor cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.
*116 Id. at 396. The threshold for showing undue hardship is a high one and "will not be based simply on the debtor's difficulty in making payments." Williams v. New York State Higher Educ. Ser. Corp. (In re Williams), 296 B.R. 298, 302 (S.D.N.Y.2003). The Debtor is responsible for satisfying each of the prongs of the Brunner test; failure to do so will result in the court refusing to discharge the student loans.
The Debtor's satisfaction of each of the factors of the Brunner test is discussed below.
I. The Debtor Has Demonstrated She Cannot Maintain a Minimum Standard of Living While Repaying Her Student Loans.
In applying the first prong of the Brunner test, courts generally "require more than temporary financial adversity and typically stop short of utter hopelessness." Tenn. St. Assistance Corp. v. Hornsby (In re Hornsby), 144 F.3d 433, 437 (6th Cir.1998); see also, United Student Aid Funds, Inc. v. Nascimento (In re Nascimento), 241 B.R. 440, 445 (9th Cir. BAP 1999). A debtor must show that she has minimized her expenses but need not live in abject poverty to qualify for a discharge. See Nys v. Educational Credit Management Corp., 308 B.R. 436, 446 (9th Cir. BAP 2004) (holding "the mere fact that a debtor earns above the poverty level is not itself a basis for finding there are no additional circumstances showing that the inability to pay will persist").
As stated above, the Debtor has a substantial deficit in a budget that demonstrates a frugal life-style and a standard of living that cannot be called extravagant. ECMC nevertheless argues that the Debtor's income is too high and, in any event, sufficiently above the Federal Poverty Guidelines that she is disqualified, as a matter of law, under the first prong of the Brunner test. ECMC further contends that the Debtor's expenses could be significantly lowered by eliminating all those expenses that the Debtor pays on behalf of her mother. As discussed below, the Court is not persuaded by either of these arguments.
A. The Debtor's Revised Budget Is Reasonable and Need Not Be Further Amended
ECMC argues that the Debtor's proposed budget is inflated and can be trimmed so that the Debtor would have the ability to repay her student loans. Other than her mother's expenses and $100 in medical costs, however, ECMC's proposed "counter-budget" for the Debtor does not eliminate any expense as extravagant or above the minimum level. Since the Debtor would still have a deficit if she reduced her medical expenses by $100 per month, ECMC's real argument is that the Debtor is not legally obligated to care for her mother and that the Court should exclude any expenses the Debtor pays on her mother's behalf. The Debtor, on the other hand, contends that the Bankruptcy Code does not limit "dependents" to children or other individuals a debtor has a legal obligation to support.
As quoted above, Congress provided specifically for consideration of both "the debtor and the debtor's dependents" in determining whether failure to discharge a student loan would "impose an undue hardship. . . ." 11 U.S.C. § 523(a)(8). Dependents therefore must be considered. The Bankruptcy Code does not, however, define "dependent" or provide any direct guide as to the characteristics of a dependent eligible to be considered in the "undue hardship" calculus. The cases cited by ECMC do little to shed light on the proper definition of a "dependent"; rather they principally involve a debtor making *117 voluntary payments for the benefit of a family member who, the court found, was not "dependent" on the debtor. See Fish v. Sallie Mae, Inc., 302 B.R. 503 (W.D.Penn.2003) (holding that debtor's payments on behalf of his adult son's student loans cannot be considered in the standard of living calculus); Holtorf v. Ill. Student Assistance Comm'n, 204 B.R. 567, 572 (Bankr.S.D.Cal.1997) (debtor was voluntarily making mortgage payments for his mother and "has made no showing of his mother's financial resources, or that she in any way depends on his contributions to ensure repayment of the loan"). Two Texas cases found that a debtor's mother's expenses should be excluded because the debtor had no legal obligation to support her, but in both of those cases the mother actually provided support to the debtor, there was no indication that the mother was in fact dependent on the debtor for her livelihood, and the mother was not listed as a dependent on the debtor's tax return. Coveney v. Costep Servicing Agent (In re Coveney), 192 B.R. 140 (Bankr.W.D.Tex.1996); Stebbins-Hopf v. Tex. Guar. Student Loan Corp. (In re Stebbins-Hopf), 176 B.R. 784, 787 (Bankr.W.D.Tex.1994).
No reported case has been found defining dependent for the purposes of § 523(a)(8), but courts have considered the meaning of the term "dependent" in relation to other provisions of the bankruptcy laws. In re Dunbar, 99 B.R. 320 (Bankr.M.D.La.1989), held that Congress' decision not to define "dependent" for the purposes of the bankruptcy laws requires courts to use the common, ordinary meaning of the word, and it defined "dependent" to mean "a person who reasonably relies on the debtor for support and whom the debtor has reason to and does support financially." 99 B.R. at 324-25. The Dunbar decision is particularly useful because the court there was considering the scope of the term "dependent" as used in a Chapter 7 debtor's schedule of current income and expenditures, mandated by Bankruptcy Rule 1007(b)(1) and in the form prescribed by Official Form No. A(3) (requiring the debtor to list dependents "the debtor supports"). That form is provided so that the court and the U.S. Trustee will have information sufficient to make a determination whether a Chapter 7 petition is a "substantial abuse" of the bankruptcy laws within the meaning of 11 U.S.C. § 707(b). There is no obvious reason to use a different definition of dependent to determine whether a Chapter 7 filing is "abusive" as opposed to determining whether a student loan burden is "undue."
Several decisions have considered the definition of dependent in connection with a dispute as to whether an individual debtor's Chapter 13 plan applies all of the debtor's "disposable income" over three years to making payments under the plan. 11 U.S.C. § 1325(b)(1)(B). The term "disposable income" is defined as "income which is received by the debtor and which is not reasonably necessary to be expended [among other things] for the maintenance and support of the debtor or a dependent of the debtor." 11 U.S.C. § 1325(b)(2)(A). The cases uniformly give the term "dependent" a balanced, common sense definition, several citing the Dunbar case. In re Bauer, 309 B.R. 47, 49-52 (Bankr.D.Idaho); In re Gonzales, 157 B.R. 604, 609-611 (Bankr.E.D.Mich.1993); In re Rigdon, 133 B.R. 460, 462-67 (Bankr.D.Ill.1991); In re Collopy, 99 B.R. 384 (Bankr.S.D.Ohio 1989). Decisions have held that even dependents who did not satisfy the Internal Revenue Service definition of "dependent" were nevertheless sufficiently dependent on the debtor for support to be accounted for in determining disposable income. See In re Tracey, 66 B.R. 63 (Bankr.D.Md.1986) (holding that the IRS *118 definition of dependent is too narrow for the purposes of § 1325(b)(2)(A)); see also, L. King, et al., Collier on Bankruptcy ¶ 1325.08.
It is noteworthy that no reported case has been found that holds that a person who meets the IRS definition of dependent and is taken as a dependent on the debtor's tax returns should nevertheless be excluded as a dependent for purposes of either § 1325(b)(2)(A) or § 523(a)(8). It is therefore particularly pertinent that the Debtor here established that her mother qualifies as a legal dependent as defined by the IRS and that the Debtor has in fact taken her mother as a dependent on her tax returns. The IRS has set forth five "tests" for a dependent:
(i) Member of Household or Relationship Test
(ii) Citizen or Resident Test
(iii) Joint Return Test
(iv) Gross Income Test
(v) Support Test
IRS, Your Federal Income Tax, Publication 17 at 29. In order for an individual to be claimed as a dependent, each of the tests must be satisfied. The evidence demonstrates that the Debtor's mother satisfies each of these five tests, that she would be considered a dependent for the purposes of the Internal Revenue Code, and that there is no reason to exclude her as such for purposes of the Bankruptcy Code.
(i) The Member of Household or Relationship Test
Under to the IRS guidelines, this test is satisfied where the putative dependent either "lives with [the taxpayer] for the entire year as a member of [the] household, or [is] related to the taxpayer." Included in the IRS's definition of a "related" person is the taxpayer's "parent, grandparent, or other direct ancestor. . . ." There was some dispute at trial as to the length of time the Debtor's mother had been in California, although she had resided with the Debtor for part of the year. For definitional purposes, however, the Debtor's mother qualifies as a dependent regardless of the amount of time she spends with the Debtor. Thus, the Debtor would satisfy the Relation Test regardless of the fact that her mother may have resided with a sister in California for a part of the calendar year.
(ii) The Citizen or Resident Test
The IRS next tests whether the putative dependent was "a U.S. Citizen or resident . . . for some part of the calendar year in which" the taxpayer seeks to declare her as a dependent. The undisputed testimony is that the Debtor's mother lived with her for part of the year, lived with the Debtor's sister in California for part of the year, and spent a few months with family in Peru. The IRS regulations only require that the putative dependent spend some part of the calendar year in the United States. Id. at 29. The undisputed testimony here is that the Debtor's mother spends most of the calendar year in this country, which satisfies the Resident Test.
(iii) and (iv) Joint Return and Gross Income Tests
The next two tests focus on the putative dependent's tax filing status. First, the putative dependent and the taxpayer cannot file a joint return. In the case at bar, the undisputed testimony is that the Debtor's mother has no income of her own and does not file a joint tax return with the Debtor, thereby satisfying this test.
Next, the putative dependent's gross income must be below the statutory maximum. The evidence is that the Debtor's mother has no personal income, and therefore *119 is well below the statutory maximum. The Debtor has also satisfied this test.
(v) Support Test
The final test examines whether a taxpayer provides more than half of the putative dependent's financial support. The amount of support is measured by "comparing the amount [the taxpayer] contributed to that person's support with the entire amount of support that a person received from all sources." IRS Publication 17 at 30.
In the present case, the testimony is that the Debtor provides nearly all the support for her mother, except for her sister's de minimis help. She testified without contradiction that her sister is employed in a temporary, low-paying job and does not have the ability to pay for their mother's expenses. The Debtor has two brothers but, as indicated above, both are disabled and are a drain on the Debtor's resources.[2] Based on the credible testimony, the Court finds that the Debtor would also satisfy the Support Test as to her mother.
Based on the foregoing, the Debtor has established that her mother would be a dependent under the IRS definition. Nor are there special circumstances in this case that would make the IRS definition of "dependent" inappropriate for § 523(a)(8) purposes. For example, there is no evidence that the Debtor's other family members are better able to provide for their mother's support, or that her mother's expenses have been assumed by her as a means of inflating her obligations at the expense of the ECMC. Nothing in the Bankruptcy Code or case law suggests that a debtor should be forced to refuse to support a parent who has no other viable means in order to be better able to repay a student loan.[3] On the contrary, as quoted above, the statute provides that a student loan should be discharged where repayment would "impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). Where a debtor demonstrates that she is supporting a family member who qualifies as a dependent under the IRS guidelines and is listed on the debtor's tax returns as a dependent, and where there is no evidence that the debtor has undertaken these obligations to avoid her obligations to creditors or has acted in bad faith, a court has no grounds to exclude these expenses in considering whether repayment of a student loan would be an undue hardship.
B. The Debtor Has Demonstrated that She Subsists at a Minimal Standard of Living
ECMC argues more generally that the Debtor does not satisfy the first part of the Brunner test because "unmarried, single debtors, or even debtors with dependents and annual incomes approximately the same or even substantially less than [the Debtor's], were able to maintain a minimal standard of living while making payments toward their student loans." (Def. Post Tr. Mem. at 17). However, the cases cited by the ECMC generally deal with single debtors who had no dependents *120 and no significant ongoing expenses. See In re O'Flaherty, 204 B.R. 793 (Bankr.N.D.Ala.1997) (unmarried man with no dependents, annual salary of $31,000 and existing bank account of $18,000 could maintain a minimal standard of living); In re Maschka, 89 B.R. 816 (Bankr.Neb.1988) (unmarried woman with no dependents with income of approximately $15,800 per year but monthly budget of over $300 could maintain a minimal standard of living); In re Medeiros, 86 B.R. 284 (Bankr.M.D.Fla.1988) (woman with no dependents with annual gross salary of approximately $17,000 and monthly budget surplus of almost $150.00 following one-time medical bills was able to maintain a minimal standard of living). None of these dealt with an individual attempting to maintain a household in New York City. Compare In re Lebovits, 223 B.R. 265 (Bankr.E.D.N.Y.1998), where a husband and wife living in the New York City area discharged a student loan where the family had far higher income than this Debtor but even higher expenses.
The facts in the case at bar paint an altogether bleaker picture than do facts in ECMC's cases. The Debtor currently earns $2,300 net of taxes per month at her current place of employment. However, as discussed previously, she has no health care benefits and reasonable monthly expenses of $3,293.76, the bulk of which are rent and her mother's and her medical expenses.[4] Unlike the debtors in many of the cases cited by ECMC, the Debtor does not have a budget surplus, and is instead considerably over-budget each month. If the Debtor's budget were reduced solely to rent, food, medical expenses, and her transportation to and from work, the Debtor would still need $2781.74 and have a deficit compared to her monthly salary. Moreover, it is worth noting that the Debtor's budgeted expenses are well below the amounts in the IRS publication Housing and Allowable Living Expenses, which sets forth the monthly totals that the IRS considers to be reasonable and necessary expenses in determining the monthly amount a taxpayer can access from earnings to pay delinquent taxes.[5]
ECMC finally argues that the Debtor's income is above the limits in the Federal Poverty Guidelines (the "Poverty Guidelines"). This argument, however, over-emphasizes the weight to be given to the Poverty Guidelines in determining a minimum standard of living under the Brunner test.
The Poverty Guidelines were promulgated by the Federal Department of Health and Human Services as a means of determining a family's eligibility for certain need-based federal programs. Annual Update of the HHS Poverty Guidelines, 69 Fed.Reg. 7336-7338 (2004). However, neither Congress nor the courts have linked discharge of student loans exclusively to the Poverty Guidelines. See In re Pincus, 280 B.R. 303, 317 (Bankr.S.D.N.Y.2002); see also 4 Lawrence P. King, et al., Collier on Bankruptcy at ¶ 523.14[2] (15th rev. ed. 2003) ("The federal poverty level is too strict a standard for measuring whether the debtor's standard of living is at a minimal standard level and should not be employed for that purpose."). ECMC does not point to any case where a court used the Poverty Guidelines as a baseline *121 for student loan discharge, and none has been found.[6]
The evidence is sufficient to show that the Debtor meets the first prong of the Brunner analysis.
II. The Debtor Has Demonstrated Additional Circumstances Likely to Continue for the Remainder of the Repayment Period
The second prong of the Brunner test requires a debtor to show that additional circumstances exist indicating that the current state of affairs is likely to persist for a significant portion of the repayment period. See Brunner, 831 F.2d at 396. The District Court in Brunner explained that such "additional circumstances" could include "illness, a lack of useable job skills, the existence of a large number of dependents, or a combination of these." Brunner v. New York State Higher Education Services Corp., 46 B.R. 752, 755 (S.D.N.Y.1985) (citations omitted).
At trial, the Debtor introduced evidence demonstrating that she is suffering from a number of maladies, including chronic depression and asthma. The Debtor refused to overstate the effect of these illnesses, noting that they do not preclude her from working. However, they do support the conclusion that she is unlikely to be able to find full-time, permanent employment at a substantial salary and that her marginal employment status is likely to continue.
The Debtor's employment history bears this out. She was laid off in 2001 and has since engaged in an unsuccessful 16-month search for a new job that would provide long-term permanent employment with a salary sufficient to cover her student debt. During that period she worked part-time, when possible, but was forced to exhaust her life savings and 401(k) plan. She testified without contradiction that she has consulted more than 100 recruiters and sent out more than 3000 resumes in an effort to find a permanent job. The response has been negative. Her position did not improve markedly by reason of her present job because it is temporary and when it ends, she will face the same challenges with a reduced safety net. There is thus little reason to believe that this Debtor is likely to obtain more lucrative full-time employment with medical care in the foreseeable future.[7] As she enters her 50's, it is likely that her efforts to find employment will only become more difficult. The cases recognize that the long-term prospects are not favorable for a middle-aged person with few skills and demonstrable medical problems. See In re Brown, 239 B.R. 204 (S.D.Cal.1999); Dotson-Cannon v. Dep't of Educ., 206 B.R. 530 (Bankr.W.D.Mo.1997); Jackson v. ECMC, 2004 WL 952882 (N.D.Ohio April 30, 2004); see also, Berry v. Educ. Credit Mgmt. Corp. (In re Berry), 266 B.R. 359, 364-65 (Bankr.N.D.Ohio 2000).[8]
*122 Debtors may not rely on their limited earnings where "his or her financial distress is self imposed." Grigas v. Sallie Mae Servicing Corp. (In re Grigas), 252 B.R. 866, 875 (Bankr.D.N.H.2000). But, in this case, the uncontroverted evidence is that the Debtor's financial condition is anything but of her own making and that her future prospects are grim. If, as ECMC argues, the best indicia of the Debtor's future prospects is her past, then the Debtor is in for a long winter.
The Debtor also established that she expends considerable funds for the care of her mother and that such expenses are likely to continue throughout the repayment period. These circumstances constitute the "additional circumstances" required by the second prong of the Brunner test. On this point, ECMC argues that the Debtor's mother is not a qualifying dependent and therefore cannot be considered under the second prong of the Brunner analysis. That argument is rejected for the reasons stated above. Moreover, cases have held that the "additional circumstances" test is met where a debtor shows that being forced to repay student loans will have a negative impact on dependents. See Lebovits, 223 B.R. at 265; In re Windland, 201 B.R. 178 (Bankr.N.D.Ohio 1996). In the case at bar, the uncontroverted evidence is that the majority of the Debtor's "discretionary" spending is for her sick, aged mother. If the Debtor were forced to repay her student loans, she would no longer have the resources to pay her mother's medical or other expenses. Based on the circumstances, this negative impact on a dependent is an "additional circumstance" as contemplated in the Brunner test.
The Court must next consider whether these "additional circumstances" are likely to continue through a "significant portion of the repayment period." Brunner, 831 F.2d at 396. ECMC argues that because the Ford Direct Loan Program extends the repayment period for twenty years, the Court should consider whether the Debtor's circumstances are likely to persist for the better part of twenty years. The Debtor contends that since her financial condition does not allow her to participate in the Ford Program (as further discussed below), an extended repayment period would not be applicable. There is no need to resolve this issue because, on the basis of this record, the Debtor's circumstances are likely to continue for a significant portion of the repayment period, even if the period were extended to twenty years.
Thus, the Court cannot accept ECMC's argument that the Debtor's hardship will abate when she receives full-time employment with health benefits. The Court cannot assume that she will receive such employment. In any event, many of the Debtor's medical expenses are for her mother, and no evidence was presented that the Debtor's medical insurance would likely cover her mother's care. Thus, even if the Debtor were to obtain health care for herself, she would still have to pay over $600 per month on health care for her mother. Moreover, there is no evidence that the Debtor's mother will not be a dependent during the greater part of the repayment period.
On this record the Debtor has satisfied her burden of showing that it is likely that the hardship will continue throughout the repayment period, and therefore the Debtor has satisfied the second prong of Brunner.
III. The Debtor Has Made a Good Faith Effort to Repay Her Loans
Finally, as the third part of the Brunner analysis, the Court must consider *123 whether the Debtor has made "good faith efforts to repay the loans." Brunner, 831 F.2d at 396. A lack of good faith is not measured solely by a debtor's failure to make payments, but rather "turns on several considerations including the debtor's efforts to maximize his income, minimize his expenses, and participate in alternative repayment options." See Lebovits, 223 B.R. at 274.
ECMC argues that the Debtor's failure to enter the Ford Program is a per se failure to satisfy of the third prong of the Brunner test. Courts generally treat refusal to enter an income contingent repayment plan as some evidence of bad faith; however, it is not dispositive. See Ford v. Student Loan Guarantee Foundation of Arkansas, 269 B.R. 673 (8th Cir.BAP2001). In any event, the Debtor did consider the Ford Program, but correctly concluded it would not work for her. The evidence is that the Debtor would still be forced to pay $150 per month under the Ford Program  payments that she cannot afford in a budget pared down to necessities. Under the present circumstances, the Court finds that the Debtor's failure to enter the Ford Program does not evidence bad faith.
Most important, the uncontroverted evidence demonstrates that the Debtor diligently paid her student loans while she was able, making approximately 54 monthly payments totaling almost $13,000 toward her overall student loan balance. Upon losing her full-time position, she became unable to continue to make payments, and ultimately filed a Chapter 7 petition. Considering all the circumstances, the Court finds that the Debtor's attempts to minimize expenses and maximize income, and the fact that she paid her student loans when able sufficiently demonstrates the Debtor's good faith.

Conclusion
Congress drafted the bankruptcy laws so as to provide an honest debtor with a discharge and a fresh start. Bruning v. United States, 376 U.S. 358, 361, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964). Congress clearly intended to "make the discharge of student loans more difficult than that of other nonexcepted debt." Brunner 831 F.2d at 396. However, Congress did not deny all recourse to a debtor. The Debtor has satisfied each element of the Brunner test and is entitled to a judgment discharging her student loans.
The Debtor is to settle a judgment on five days' notice.
NOTES
[1] There is no issue that the Debtor is seeking to discharge "student loans."
[2] However, the Debtor's proposed budget includes only a de minimis amount on behalf of one of her brothers.
[3] Such a policy would fly in the face of the concern that religious and social values not be ignored in the application of the bankruptcy laws. See the Religious Liberty and Charitable Donations Act of 1998, Pub.L. No. 105-183, 112 Stat. 517 (June 19, 1998) that, among other things, amended § 707(b) and § 1325(b)(2)(A) of the Bankruptcy Code to give a special status to charitable contributions made by a debtor.
[4] ECMC does not argue that the Debtor should move out of Manhattan to reduce her rent, as her rent is already subject to rent regulation and is below the market.
[5] The IRS allows the following monthly amounts for two or more persons living in New York County: $3,472 rent; $409 food; $103 apparel and services; $132 miscellaneous.
[6] The closest decision linking the two is in Elmore v. Mass. Higher Educ. Assist. Corp. (In re Elmore), 230 B.R. 22, 28 (Bankr.D.Conn.1999). There, however, the debtor had a family income four times greater than Poverty Guidelines and a monthly budget surplus.
[7] According to the Occupational Employment Statistics, published by the United States Department of Labor, Bureau of Labor Statistics, the median salary for a worker providing "Office and Administrative Support Occupations" in New York City in 2003 was only $2676.80 per month. See Bureau of Labor Statistics, November 2003 Metropolitan Area Occupational Employment and Wage Estimates available at http://www.bls. gov/oes/current/oes_5600.htm# b43-0000 (last visited March 15, 2005).
[8] By contrast, this Debtor does not resemble those recent graduates, like Brunner herself, who make no effort to repay their student loans. It was precisely this type of person that Congress had in mind when it adopted § 523(a)(8). See, e.g., the Senate Report on the 1978 Bankruptcy Code, S.Rep. No. 94-882, at 32 (1976).